170 F.3d 1146
 335 U.S.App.D.C. 214, 60 Soc.Sec.Rep.Ser. 725
 PRESBYTERIAN MEDICAL CENTER OF THE UNIVERSITY OF
PENNSYLVANIA HEALTH SYSTEM, Appellant
v.
Donna E. SHALALA, Secretary, United States Department of
Health and Human Services, Appellee
 No. 98-5233.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 4, 1999.
Decided April 2, 1999.
 
 Appeal from the United States District Court for the District of Columbia (No. 95cv01939)
 Jennifer A. Stiller argued the cause for appellant. With her on the briefs was L. Peter Farkas.
 Carl E. Goldfarb, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, Wilma A. Lewis, U.S. Attorney, and Scott R. McIntosh, Attorney.
 Before: GINSBURG, HENDERSON and TATEL, Circuit Judges.
 Opinion for the Court filed by Circuit Judge TATEL.
 TATEL, Circuit Judge:
 
 
 1
 This case involves Medicare's scheme for reimbursing teaching hospitals for the costs of graduate medical education. After the Secretary of Health and Human Services denied appellant teaching hospital's petition for increased reimbursement of such costs, appellant sued in federal district court, challenging the legality of an interpretive rule requiring the requested increase to be supported by contemporaneous documentation, and alleging that an error in the administrative proceedings prejudiced its claims. Finding the interpretive rule consistent with the Department's regulations, and finding no error in the administrative proceedings, we affirm the district court's grant of summary judgment for the Secretary.
 
 
 2
 * Medicare reimburses teaching hospitals for the cost of graduate medical education ("GME"), including physician time attributable to instruction and supervision of interns and residents. See 42 U.S.C. § 1395ww(h) (1994). Prior to 1986, teaching hospitals claimed GME reimbursement by preparing annual cost reports showing the portions of physician time attributable to research, patient care, and teaching and supervising interns and residents. To obtain approval of these expenses, hospitals submitted cost reports to fiscal intermediaries, usually insurance companies under contract with the Department of Health and Human Services. The Department required each hospital to support its claim for GME reimbursement with "a written allocation agreement between the [hospital] and the physician that specifies the respective amounts of time the physician spends" on research, patient care, and teaching and supervision. 42 C.F.R. § 405.481(f)(1)(i) (1985). Each hospital also had to "[m]aintain the time records or other information it used to allocate physician compensation in a form that permits the information to be validated by the intermediary," id. § 405.481(g)(1), and to "[r]etain each physician compensation allocation, and the information on which it is based, for at least four years after the end of each cost reporting period to which the allocation applies," id. § 405.481(g)(3).
 
 
 3
 In 1986, Congress created a new GME reimbursement formula for cost reporting periods beginning on or after July 1, 1985. See Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L. No. 99-272, 100 Stat. 82, 171-75 (1986) (codified as amended at 42 U.S.C. § 1395ww(h) (1994)) ("GME statute"). Under the new scheme, the Secretary determines for each hospital "the average amount [of GME costs] recognized as reasonable" per full-time resident during a designated "base period," defined as "the hospital's cost reporting period that began during fiscal year 1984." 42 U.S.C. § 1395ww(h)(2)(A). Applying a statutory formula to each hospital's base-year per-resident amount, the Secretary then calculates the hospital's GME reimbursement for subsequent cost-reporting periods. See id. § 1395ww(h)(2)-(3).
 
 
 4
 In 1989, the Department issued regulations establishing procedures for determining the "reasonable" amount of base-year GME costs for each hospital. See 54 Fed.Reg. 40,286 (1989) (codified at 42 C.F.R. § 413.86 (1998)). (From here on, all "C.F.R." citations refer to current regulations unless otherwise noted.) The GME regulations direct fiscal intermediaries to reexamine the cost reports that hospitals had submitted for the base year and to reaudit "hospitals whose base-period GME costs appear to include misclassified or nonallowable costs or whose per resident amounts appear to be unreasonably high or low." Id. at 40,288; see 42 C.F.R. § 413.86(e)(1). To prevent over-reimbursement, the regulations instruct intermediaries to deduct from each reaudited hospital's base-year GME amount any operating costs misclassified as GME costs. See id. § 413.86(e)(1)(ii)(B). To prevent under-reimbursement--the issue in this case--the regulations authorize intermediaries, "[u]pon a hospital's request," to include in the base-year GME amount any GME costs misclassified as operating costs in the base-year cost report. See id. § 413.86(e)(1)(ii)(C).
 
 
 5
 Soon after the reauditing process began in 1989, it became clear that many hospitals no longer had contemporaneous physician time records to support GME costs claimed in the base year. Applicable regulations had required hospitals to keep such records for only four years after the relevant cost-reporting period. See 42 C.F.R. § 405.481(g) (1985). The Department therefore issued a special GME documentation policy for reaudits, first as an official instruction to fiscal intermediaries, see HEALTH CARE FINANCING ADMIN., GRADUATE MEDICAL EDUCATION: DOCUMENTATION TO SUPPORT THE PHYSICIAN COST/TIME ALLOCATION (1990) ("HCFA INSTRUCTION"), and then as a published notice in the Federal Register, see 55 Fed.Reg. 35,990, 36,063-64 (1990). The parties agree that this documentation policy is an interpretive rule. See 5 U.S.C. § 553(b)(A).
 
 
 6
 The interpretive rule provides the following "exception to the established record-keeping policy":
 
 
 7
 As an equitable solution to the problem of the nonexistence of physician allocation agreements, time records, and other information, we are allowing providers to furnish documentation from cost reporting periods subsequent to the base period in support of the allocation of physician compensation costs in the GME based period.... It is only in the absence of base period documentation that subsequent documentation should be considered as a proxy for base period documentation....
 
 
 8
 55 Fed.Reg. at 36,063-64. Where a hospital legitimately explains the absence of base-year documentation, the intermediary must advise the hospital that "it may request the special exception described above." Id. at 36,064 col.1. Hospitals requesting the exception must submit "the documentation from the subsequent cost reporting period closest to the direct GME base period." Id. If such records are also unavailable, the hospital may support its base-year GME costs by "perform[ing] a 3-week time study of all physicians' time for a period to be specified by the intermediary." Id.
 
 
 9
 Of particular importance to this case, the interpretive rule states as follows: "In no event will the results obtained from the use of the records from a cost reporting period later than the base period serve to increase or add physician compensation costs to the costs used to determine the per resident amounts." Id. The rule concludes:
 
 
 10
 We would stress that the use of documentation from the current year or a subsequent year is, at best, persuasive evidence rather than conclusive evidence [of base-year GME costs]. Accordingly, if the intermediary believes that any of the changes or modifications distort the reliability of the data, it will make whatever adjustments are necessary to ensure an accurate cost allocation. In addition, the intermediary will prepare a written statement documenting the facts and its conclusions concerning how the information distorts the realiability [sic] of the data and why the data should not be relied upon. Also, the intermediary will explain why its adjustments are appropriate. This statement will become part of the record as it may be used to support any action taken in subsequent reviews and appeals.
 
 
 11
 55 Fed.Reg. at 36,064 col.2.
 
 
 12
 Appellant Presbyterian Medical Center is a teaching hospital whose GME base period is the fiscal year that ended on June 30, 1985. Presbyterian received notice of reimbursement for that cost-reporting period in September 1988. The notice stated that the Department could re-examine the 1984-85 cost-reporting period at any time up to three years after the date of the notice (i.e., until September 1991).
 
 
 13
 Acting pursuant to the GME statute and regulations, Presbyterian's fiscal intermediary, Aetna Life Insurance Co., reaudited the hospital's 1984-85 cost report in 1990. Aetna mailed Presbyterian a copy of the HCFA Instruction. Shortly thereafter, Aetna sent Presbyterian a progress report, noting that the hospital failed to provide any documentation supporting its 1984-85 cost report. Attaching a second copy of the HCFA Instruction, Aetna warned that without documentation, it would remove all physician compensation from Presbyterian's base-year GME costs. This time Presbyterian responded. It sent Aetna two types of non-contemporaneous documentation: physician time records for fiscal years 1986-88 and a three-week physician time study for the period from October 1 to October 21, 1990.
 
 
 14
 After completing the reaudit, Aetna set Presbyterian's base-year GME reimbursement rate at the level the hospital originally claimed in its 1984-85 cost report. In doing so it rejected, without written explanation, Presbyterian's request for an additional $828,000 in GME costs that had allegedly been misclassified as operating costs in the base-year cost report. Beyond the 1986-88 time records and the 1990 time study, the hospital failed to submit any documentation to support its request.
 
 
 15
 The Provider Reimbursement Review Board reversed Aetna's determination. See Presbyterian Med. Ctr., 95-D41, Docket No. 91-2779M (PRRB 1995). Holding that the interpretive rule violates the GME statute and regulations, the Board refused to enforce the prohibition on using non-contemporaneous records during reaudit to support GME costs exceeding those originally claimed in the base year. See id. at 8-9. According to the Board, Presbyterian's "later period proxy data"--in particular, the 1990 time study--adequately supported the GME increase. Id. at 9.
 
 
 16
 The Health Care Financing Administration, acting on behalf of the Secretary, reversed the Board. See Presbyterian Med. Ctr., Review of PRRB Decision No. 95-D41 (HCFA 1995). Reaffirming the policy that additional base-year GME costs claimed during reaudit must be supported by contemporaneous documentation, and finding no such documentation in the record, HCFA denied Presbyterian's requested GME increase. See id. at 11-12.
 
 
 17
 Presbyterian filed suit in the United States District Court for the District of Columbia, arguing (1) that the interpretive rule violates the GME statute and regulations; (2) that the administrative proceedings were tainted by prejudicial error due to Aetna's failure to provide Presbyterian a written report explaining why it denied the requested GME increase; and (3) that the decision was arbitrary and capricious because no statute or regulation required the hospital to keep its 1984 records more than four years. The district court rejected each claim and granted summary judgment for the Secretary. See Presbyterian Med. Ctr. v. Shalala, No. 95-1939 (D.D.C. Apr. 21, 1998) (memorandum opinion & order) ("Mem. Op."). Applying Chevron deference, the district court concluded that the interpretive rule conflicts with neither the GME statute nor the GME regulation. See id. at 7-12. Although "somewhat troubled by the intermediary's failure to provide the hospital with a written report" explaining its denial of Presbyterian's requested increase, the court determined that the hospital "ha[d] not demonstrated any way in which it was harmed" by the alleged error. Id. at 7. The court also said that Presbyterian "logically should have kept its 1984 records until at least September 1991," pointing out that in September 1988 the hospital had received a reimbursement notice for the base-year cost-reporting period which stated that the Department could reopen this period for review at any time within the next three years. Id. at 12.
 
 
 18
 On appeal, Presbyterian challenges the district court's ruling that the interpretive rule does not violate the GME regulations, as well as its determination that Aetna's failure to issue a written report was not prejudicial. Reviewing the district court's decision de novo, see Independent Bankers Ass'n of America v. Farm Credit Admin., 164 F.3d 661, 666 (D.C.Cir.1999), we consider each claim in turn.
 
 II
 
 19
 In evaluating whether an agency has permissibly interpreted its own regulation, we owe the agency "substantial deference." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). We give the agency's interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation." Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945).
 
 
 20
 The regulations nowhere specify what documentation is required to support a requested increase in base-year GME costs. Although the Department asserts that section 413.86(j)(2)(ii) (now codified at 42 C.F.R. § 413.86(k)(2)(ii)) requires "sufficient documentation" to support a GME increase in the reaudited base year, that requirement actually applies to requests for adjustments in reimbursement rates for "the rate-of-increase ceiling base year or prospective payment base year." 42 C.F.R. § 413.86(k)(2)(i). Presbyterian claims that the interpretive rule, by allowing non-contemporaneous records to support GME costs claimed in the base-year cost report, while requiring contemporaneous records to support GME costs misclassified as operating costs, frustrates the regulatory goal of ensuring "an 'accurate' determination of providers' 1984 GME costs." Regions Hosp. v. Shalala, 522 U.S. 448, 118 S.Ct. 909, 914, 139 L.Ed.2d 895 (1998) (citing Department's proposed rule).
 
 
 21
 We disagree. GME costs claimed in the base year have already gone through a verification process requiring contemporaneous documentation. See 42 C.F.R. § 405.481(f)(1)(i) (1985). Additional GME costs claimed during reaudit have not. Because "later year records [are] inherently less reliable," and because "hospitals ha[ve] significant incentives to inflate their GME costs in the base year," Mem. Op. at 10; see 55 Fed.Reg. at 35,064 col.2 (non-contemporaneous records are, "at best, persuasive evidence rather than conclusive evidence"), we think the interpretive rule, by prohibiting non-contemporaneous records from supporting GME costs never supported by contemporaneous records, reasonably furthers--not frustrates--" 'accurate' determination" of GME costs. Regions Hosp., 118 S.Ct. at 914. Because nothing in "the regulation's plain language or ... the Secretary's intent at the time of the regulation's promulgation" compels an alternative reading, we defer to the agency's interpretation. Thomas Jefferson, 512 U.S. at 512, 114 S.Ct. 2381; see id. ("This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.' ") (citations omitted).
 
 
 22
 Relying on the Department's acknowledgment that "in many cases ... [contemporaneous] records no longer exist for the (GME) base period," HCFA INSTRUCTION at 1; see 55 Fed.Reg. at 36,063 col.3 (noting that 42 C.F.R. § 405.481(g) (1985) "only require[d] the retention of [such records] for four years after the end of each cost reporting period"), Presbyterian next argues that the interpretive rule effectively nullifies the regulatory provision allowing hospitals to claim base-year GME costs misclassified as operating costs, see 42 C.F.R. § 413.86(e)(1)(ii)(C). We agree with the district court that on the facts of this case, this argument is without merit. Presbyterian's September 1988 notice of reimbursement for the base-year cost-reporting period clearly stated that the Department could re-examine this period at any time within the next three years. The hospital "logically should have kept its 1984 records until at least September 1991." Mem. Op. at 12.
 
 III
 
 23
 We turn to Presbyterian's claim of prejudicial error. It argues that the Department's interpretive rule required Aetna to explain in writing why it denied the hospital's requested GME increase. According to the hospital, had it known that Aetna considered its 1990 time study and 1986-88 time records inadequate, it would have submitted physician time allocation agreements, so-called "339s," from the base-year cost-reporting period instead. The absence of a written explanation, Presbyterian claims, caused it to forgo producing the 339s during the administrative proceedings. Relying on the rule of prejudicial error, see 5 U.S.C. § 706; Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 521 (D.C.Cir.1983) (requiring courts to reverse agency actions if there is "a possibility that the error would have resulted in some change in the final rule") (emphasis omitted), the hospital argues that the district court should have reversed the Secretary's decision.
 
 
 24
 Presbyterian's argument fails for several reasons. To begin with, we find nothing inappropriate in Aetna's failure to issue a written explanation. The interpretive rule requires intermediaries to prepare written statements when they determine that non-contemporaneous documentation submitted in a particular case is inadequate due to specific defects that "distort the reliability of the data." 55 Fed.Reg. at 36,064 col.2. According to the rule, the written statement "document[s] the facts and [the intermediary's] conclusions concerning how the information distorts the realiability [sic] of the data and why the data should not be relied upon," and "explain[s] why [the intermediary's] adjustments [to the data] are appropriate." Id. As Presbyterian acknowledges,Aetna denied its request for additional base-year GMEcosts because the supporting documents were non-contemporaneous--not because they incorporated "changes or modifications [that] distort the reliability of the data" or because they needed "adjustments" to improve their accuracy. Id. We agree with the Department that the written statement requirement is inapplicable where, as here, an intermediary finds a set of records categorically inadequate to support an increase in base-year GME costs.
 
 
 25
 Equally unpersuasive is Presbyterian's claim that without a written explanation, it had no way of knowing that its failure to produce contemporaneous base-year records was the reason Aetna denied its requested GME increase. As the district court pointed out, Aetna twice sent the hospital a copy of the HCFA Instruction during the reaudit. See Mem. Op. at 4-5. That Instruction states, in the only underlined sentence on the first page: "In no event will the results obtained from the use of time studies or a subsequent year's data serve to increase the amount of physicians' cost originally allocated to the GME cost center." HCFA INSTRUCTION at 1. Moreover, the district court found that "the reasons for the intermediary's decision were repeatedly explained to the hospital during the administrative process." Mem. Op. at 7.
 
 
 26
 In direct tension with its claim that it had no idea why Aetna denied its requested GME increase, Presbyterian further argues that its failure to submit base-year 339s resulted from Aetna's erroneous assertions that 339s are insufficient contemporaneous documentation to support an increase in base-year GME costs. But whether or not 339s are sufficient, if Presbyterian in fact believed during the reaudit that 339s could support base-year GME costs, then it should have put those documents into the administrative record in order to preserve its claim. In doing so, it could have relied on Abbott Northwestern Memorial Hospital v. Blue Cross & Blue Shield Ass'n, Medicare & Medicaid Guide (CCH) p 43,136 (Feb. 2, 1995). Issued four months prior to the Provider Reimbursement Review Board's decision in this case and seven months prior to the Secretary's reversal, Abbott determined that 339s together with a later-year time study could support a hospital's base-year GME costs that were misclassified as operating costs. See id. at 43,653. Presbyterian's reliance on Abbott in this appeal is too little too late. Not only does the hospital fail to cite the case until its reply brief, see Doolin Sec. Sav. Bank v. Office of Thrift Supervision, 156 F.3d 190, 191 (D.C.Cir.1998) (refusing to consider arguments raised only in the reply brief), but Abbott establishes at most only that Presbyterian was potentially harmed by its failure to submit 339s, not that the harm flowed from anything other than the hospital's own inaction.
 
 IV
 
 27
 The district court's grant of summary judgment for the Secretary is affirmed.
 
 
 28
 So ordered.